I'm Greg. You're way ahead of me here. I'm sorry. First of all, I want to thank you for your service under the Criminal Justice Act. You're welcome. It was my pleasure. With that thank you, you may proceed. I represent Ricardo Omar Hernandez. Mr. Hernandez was charged with conspiring to distribute methamphetamine. He was convicted after a jury trial, and we've raised three issues in this appeal. The sufficiency of the evidence, the admissibility of three handwritten notes at trial, and then a sentencing issue as to his medical condition. I would like first to deal with the admissibility of the three handwritten notes. In that situation, what we have is a witness, Lonnie Obst, who presented during the trial, or testified about during the trial, three handwritten notes that he claimed to have received. And these notes had no signature. He testified they came to him from a third party, that he never saw Mr. Hernandez in possession of these notes, that they were not delivered to him by Mr. Hernandez. And of course, there was an objection when these were offered because they were threatening. And in fact, Judge Kupf in the Seidmar Conference about the notes said, when he read those, said, well, yes, I see these are very threatening. And essentially, they say, why are you cooperating against me? What happens to people who cooperate in kind of an implied threatening manner? So, given the nature and tone of the notes, Mr. Hernandez objected to those. And the objection was based upon hearsay, foundation, and authenticity. And our position is that authenticity was not established. And authenticity, under the Rule 901 of the Rules of Evidence, requires that a document be what the proponent claims it to be, or presents it to be. And in this case, the government's presenting these three handwritten notes as notes written by Mr. Hernandez. So, in order to establish that they're authentic, there are certain elements of proof that have to be met. And in this situation, although it started out a bit differently during the Seidmar Conference, there was some indication Mr. Obst would testify that Mr. Hernandez mouthed the words to him through a window, did you get my notes? Which would obviously be an indication if the testimony is that the defendant said, did you get my notes? And then the witness shows up at trial with notes that the notes came from the defendant. And perhaps, although there may still be some question, perhaps that would be reliable enough to show authenticity. But that's not how the evidence came out in Mr. Obst's testimony. What he said was that, no, I never heard him say, or witnessed him to say, did you get my notes? I got the notes, and then from reading them, I could tell because it was how he talked. And of course, there was no talking going on, he's referring to words on paper. And also he claimed that there was information in the notes that only Mr. Hernandez would know. So those are the two reasons that were relied upon to establish the authenticity of these notes. And on the first point, as to how he talked, well, that's like saying, I know the notes came from him because they came from him. It doesn't add anything to the analysis. If his position is, I know the notes came from him because I read them and they appeared to be written in the same manner as he spoke to me previously, the same slang terms, the same manner of speaking, that sort of thing, that may be different. But that's not what he said. He just said, I know how he talks. Well, how did he talk? We don't know. None of that evidence was presented. So on that point, I don't think that's sufficient to establish authenticity. Authenticity in the 901 is probably one of the strongest rules of evidence that discretion goes to the trial court judge who's there and sees the witnesses and hears the arguments. We don't reverse on that very often. What makes this so unique? I mean, I hear your argument. And the other thing is that the government argues that this was later corroborated by other evidence. What's your response? Number one is, why does this stand out as a very unique ruling and then was it corroborated later? Well, on your first question, it's unique in that you have a handwritten note with no signature, no fingerprints, no third party witness who says anything connecting this note to the defendant or even to the witness who claims that the note came from the defendant. You just have a single witness upon whom you are relying for all of this information to establish authenticity. And this witness, frankly, I'm sat here for the conversation about Mr. Stanko. I think this witness would have much less credibility than Mr. Stanko. This witness, well, first of all, he's been convicted of at least a half dozen, maybe more felonies. He, in my 25 years of criminal defense work, I've never come across a client or even known of a defendant who was twice convicted of being a habitual criminal. You have to work really hard at committing felonies to twice be convicted of being a habitual criminal. He was caught in a lie on the witness stand or, excuse me, on the witness stand, on the transport bus from the jail to the court. And this is in the record. He tried to get another person to lie about someone that he didn't like, his ex-girlfriend. He said, will you put weight on this person? He failed to polygraph when he was called on that. A witness testified that he tried to get him to lie about this. So there are just, he's bipolar. He has mental health issues. So on that point as to why this is a unique situation is you've got the entire basis for the authenticity hinging upon this one person who totally lacks credibility. Your second point, later corroboration. I don't recall the record as showing any kind of later corroboration. It's a little bit confusing because we're dealing, during the trial, we were dealing with two separate prison notes. There was the handwritten notes that were threatening. And then there was Exhibit 49, which was a typewritten summary of the discovery information that Mr. Hernandez was claimed to have given to an inmate by the name of David Hauser. And so, maybe I'm misinterpreting your question, but if you're referring to that as corroboration. I don't remember. I just have my hand scribbled notes that the government argues that they were corroborated by other evidence. I don't remember what the government said. And that could be what you may be remembering or what your notes may refer to is that the government's other position on this is that there was information in the notes that only Mr. Hernandez would have known. Well, there are lots of problems with that, too. First of all, the information is not information that only Mr. Hernandez would have known. There were only two points of information that really would have specifically applied to his case. One was his month of indictment. The other was his trial date. That's not information only a defendant knows. That's public record. Anybody with access to Pacer, who reads the newspaper, who talks to other persons about their cases, they'll know when a person – it's easy to find out when a person was indicted and when their trial date was. It really is not – if this could have been properly argued, well, I don't think any plausible claim could be put out there with those facts that someone else wrote this note aside from Mr. Obes. Why is this not harmless error? Just because the evidence is so strong otherwise. I don't disagree that there's plenty of evidence that Mr. Hernandez used drugs, that he sold drugs, that he associated with people who used and sold drugs, but it was charged as a conspiracy. The government must prove an agreement. And I had a client who was terminally ill, and we were able to present some evidence because of his terminal illness that may cast some doubt upon his physical ability to get out among these folks and buy and sell methamphetamine. There was evidence he was hospitalized for many, many days throughout the course of this alleged conspiracy and that he was physically ailing, had to get carried off of a plane and put into a wheelchair. So there were things that we could raise to counter the government's position, and those were likely negated because my client was painted in such a negative picture from these notes. I don't think there was really any other evidence of him being a threatening or harmful person until these notes were offered him the evidence that indicated he was threatening a witness. So that's why I think that it wouldn't be harmless error. I do agree there's plenty of evidence that he was involved with drugs and he was buying and selling drugs and associating with people doing that, but the government still must prove an agreement. And if there were any jurors who were on the fence on that issue as to whether there was an agreement, these notes certainly could have carried the day for them as far as the negative view of my client. The other issue that we haven't discussed is his request for a variance or a departure from his sentence due to his health condition. He has acute lymphoblastic leukemia. He was diagnosed in August 2012 and hospitalized, treated. Initially he refused hospitalization and treatment. But as I recall, this was all presented to the district court, to Judge Cuff, correct? Yes. And as I recall, I remember reading this transcript, it's been a while, that he discusses it, he mentions it, correct? He considered. Okay, well, now that if he's considered it, how can we say that's an abuse of discretion or an unreasonable sentence or an unreasonable that he didn't vary down or depart down? Well, because in my view, to me it's a no-brainer when somebody's terminally ill and they're going to suffer the end of life in prison. And it's different when you're terminally ill and you're in a prison hospital and your family can't come and visit you in those last days. And we talked about this in sentencing. The response is he made some life choices that put him there. Correct. But the argument that we made at sentencing was that the Bureau of Prisons has a compassionate release program. And because the judge couldn't go below the mandatory statutory minimum, which was 20 years. But if he had varied down to the 240 months, that lower sentence would be considered by the Bureau of Prisons in their compassionate release analysis and perhaps would have moved him up the list to maybe an earlier compassionate release. So that's the argument that was made. I would like to reserve the rest of my time for rebuttal. Okay. Thank you, Mr. Ding. Good morning, Ms. Fullerton. Good morning, Judge. May it please the court, Mr. Damon. I'm Sarah Fullerton. I'm an assistant U.S. attorney in the Lincoln office. I was the prosecutor on this case. Let me go right to the question, Judge Riley, that you asked about the notes. This is a situation where this court has previously said that this is a prima facie showing is all that's necessary for admission of evidence. District court judge serves as a gatekeeper. And in I think it was the Durham case, this court talked about all that's necessary is that there's a rational basis for a juror to reasonably believe that the proper evidence is what it's said to be. That's all we have to prove. We don't have to show handwriting analysis. We don't have to show fingerprints. We don't have to show any of these things. There doesn't have to be a mini trial within the trial to establish that a particular piece of evidence is what it's said to be. That determination ultimately is up to the jury, whether they believe it is or not. The district court judge's function is simply to determine whether there's some rational basis where a reasonable juror could determine that. And in this case, there was plenty of evidence for that. The three notes that we're talking about in Exhibits 50A through C, there's an interplay in how they were admitted into evidence along with another exhibit, which is Exhibit 49. And Exhibit 49 is the printed list of a number of people who were potential witnesses in this case. And that particular list was something that Hernandez told him he had obtained from his attorney. Hernandez also said that to David Houser, who was one of the other government's witnesses. Houser was a person who happened to be an inmate in the same facility with Mr. Hernandez for part of the time before Mr. Hernandez's trial. Houser had nothing else to do with this case other than the fact that he happened to be in the same correctional facility as Mr. Hernandez. And they were talking. Hernandez told him what he was in for. He was awaiting trial. Houser had already pled guilty and was awaiting sentencing. And so they're having some conversations about how the federal sentencing guidelines work and these sorts of things. And in the process, according to Houser, Hernandez tells him about a number of people that he had heard were going to testify against him on this note, which is Exhibit 49, the printed note. And one of those people was Lonnie Obst. And it so happened that Houser also knew Lonnie Obst, so they had some conversations about him. Now, before Houser was about to leave to go to another facility, Hernandez gave him Exhibit 49, which is the two-page printed list of witnesses. It includes information about Lonnie Obst. It also includes information about other people that testified at trial, Chad Vance, Ana Carlisle, Angie Shira, among the people on there. Obst said when he was in the same facility with Hernandez, Hernandez also showed him that list through the glass in a window in the prison facility. And Judge Cuff used that information, the corroborean information about Exhibit 49, in terms of what Houser had talked about, the things that Hernandez had said to him, and the fact that Obst recognized 49 as being the same list that he had seen. And that, in interplay with the information contained in those handwritten notes, Exhibit 58 through C, and the contents of those notes, put together is how Judge Cuff determined that those notes were admissible. There is information in those notes that essentially only Hernandez would know. He makes reference to when he was indicted, what his particular, his original trial date was. He makes reference to the sentence that he expected he might get. He makes reference to, in one of the notes he talks about, I don't, essentially says, you're the one who's testifying the most against me about the most drugs and guns. And in terms of the people listed on Exhibit 49, if you go through Exhibit 49, the only person whose name is on that list with a reference to gun is Lonnie Obst. So there were things within the context of those notes that were specific to Hernandez, that were specific to Lonnie Obst. There was essentially sort of a tacit admission that Obst actually had important information against him in one of the notes where he says, I'm not doing 288 months because you can't keep your lips sealed. And so there was sufficient information for the judge to say, yes, there's a prime aphasia showing that these notes are what they're purported to be, that they came from the person that they're purported to have come from. Lonnie Obst said the way the notes were written, the sort of language used, was the kind of language that Mr. Hernandez used in talking to him. And that in and of itself, that information all put together is more than sufficient to lay the very low foundation in terms of proof necessary to admit the notes into evidence. Now, the jury was free to take those notes at face value. They were free to completely ignore them. And in terms of the harmless error analysis, if you look at this case, and you look at the large amount of evidence that this defendant was involved in drug dealing, ongoing drug dealing with a number of people over time, there was more than... Mr. Dahman doesn't seriously contest that. What he contests is the inadequacy of the show. There was an agreement. In other words, they were working together. Correct, and there was sufficient evidence of that. There were a number of witnesses who talked about ongoing distributions with the defendant. Obst was one. Ana Carlyle corroborated some of what Obst said. She said that Mr. Hernandez was engaged in drug distribution with a number of people. He didn't have a driver's license, so he had a number of people who would drive him around. Those included Ana Carlyle. Those included Lonnie Obst. They would drive him to go get drugs and deliver them to other people. Angie Shira talked about an ongoing relationship with Mr. Hernandez in terms of drug distribution. And in terms of this idea that he was incapable of going out and dealing drugs, she went to him. She would go to his place and go pick up the drugs, and she took Chad Vance with her on occasion. He would drive her, and he was aware of these ongoing distributions. So there was more than sufficient information for the jury to find that Mr. Hernandez was guilty of being involved in a conspiracy. And they could certainly do that, leaving those notes completely aside. So even if the court were to find that there was some error in admitting them, and I certainly don't concede that there is, there was sufficient information that the jury had before it to find him guilty of the conspiracy, whether they considered those notes or not. And so under harmless error review, there's no reason for a reversal here. With respect to the sentencing issue, this is an abuse of discretion standard. In front of Judge Kupf was this defendant's complete record, which is not good. This is a person who, despite his diagnosis, dealt drugs before he was diagnosed, dealt drugs in between his treatment sessions, dealt drugs the entire time. This is a person who essentially, once he got the diagnosis, seemed to think he had nothing to lose. So he went about his business, continuing to deal drugs, and then he went about his business once he got arrested, attempting to intimidate witnesses because he had nothing to lose. This is a person who had a criminal history Category 6. There was evidence in the PSR about him being involved in an assault and a gang fight in a state prison when he had been in prison before. He was known to have guns, and that's another thing. There is enough evidence in the record before the jury. If they wanted to not like Mr. Hernandez, there was sufficient reason for them to not like Mr. Hernandez. The notes that Mr. Obst talked about aside, they knew from David Hauser that this is a defendant who tried to work a scheme where he could intimidate potential witnesses against him by spreading their information throughout the federal prison system. They knew he carried a gun or had guns available to him. They knew he dealt with multiple people in large quantities, and he obtained a large amount of cash doing so. So if they were going to not like Mr. Hernandez, there were plenty of reasons for them to not like Mr. Hernandez aside from those notes. But with respect to the sentence, Judge Koeff had all this other information in front of him besides the cancer diagnosis that suggested that a lesser sentence was not appropriate. And that's the finding that he made, and that's not an abuse of discretion to sentence the defendant that low end of the guidelines range in this particular case. And if there are no questions, I guess I'll sit down.  Thank you. Mr. Damman? Am I pronouncing your name right? Is it Damman? That's correct, thank you. I'm sorry if I was mispronouncing it. Maybe I'm a little dense, but it seems to me that Exhibit 49, if anything, helps my client's argument that it would be Mr. Obst who wrote the three handwritten notes because Exhibit 49 would contain information that would assist him in writing that note for those three notes. But I think what the court also needs to know is why he would do that, which is the way the guidelines work and the way the sentence reductions work, if when a defendant comes back to have his sentence reduced after cooperating, if he can present to the judge at that time that he was threatened in certain ways as a result of his cooperation, that can increase the amount of reduction he receives. And that's well known among defendants. In fact, when I represent clients who are cooperating, I tell them, if you're in prison and somebody threatens you, let me know. We need to document that, and we'll tell the judge at the time of your sentencing reduction hearing. And that often does result in a longer or larger sentence reduction. And so if you're looking for a motivation or a reason why Lonnie Obst would have fabricated notes of this type, then that certainly would be warranted. Time's expired. Thank you. Thank you. Again, thank you for your service in the Criminal Justice Act. We appreciate your arguments. We'll be back in due course. Thank you.